PREET BHARARA
United States Attorney for the
Southern District of New York
By: JESSICA JEAN HU
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2726
Facsimile: (212) 637-2717
E-mail: jessica.hu@usdoj.gov

14 MISC 00238

FILE COPY



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
IN RE:                                              :
                                                    :
LETTERS ROGATORY FOR                                :
INTERNATIONAL JUDICIAL                              :
ASSISTANCE FROM THE NATIONAL                        :
COURT OF FIRST INSTANCE IN LABOR:
MATTERS, NO. 35, BUENOS AIRES,                      :
ARGENTINA, IN THE MATTER OF                         :
DE NEVARES, ALEJANDRO v.                            :
CITIBANK N.A. ON DISMISSAL                          :
                                                    :
------------------------------------------------------x

DECLARATION OF
JESSICA JEAN HU

M 10-7

I, Jessica Jean Hu, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an Assistant United States Attorney in the Office of the United States

Attorney for the Southern District of New York, counsel for the United States of America (the

"Government"). I make this declaration upon information and belief based upon the attached

exhibits and communications with personnel in the United States Department of Justice, to which

letters rogatory have been transmitted for execution. I make this declaration in support of the

Government's request, pursuant to 28 U.S.C. § 1782(a),[1] for an order appointing me as a

Commissioner for the purpose of obtaining information from Thomson Reuters, Gisela Sucre,

Ricardo Braga, Oxford University Press, Inc., New York University School of Law, and

Citigroup Inc.

        2.      In connection with a proceeding captioned "De Nevares, Alejandro v.

Citibank N.A. on Dismissal," and pending in the National Court of First Instance in Labor

Matters, No. 35, Buenos Aires, Argentina (the "Argentine Court"), the Argentine Court issued

letters rogatory seeking information from Thomson Reuters, Gisela Sucre, Ricardo Braga,

Oxford University Press, Inc., New York University School of Law, and Citigroup Inc.  A true

and correct copy of the letters rogatory is attached hereto as Exhibit A 1-6.

        3.      An undated draft of a subpoena addressed to Thomson Reuters, Attention:

---

[1] Section 1782(a) provides, in pertinent part, as follows:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

Legal Department, 3 Times Square, New York, NY 10036, which the Government intends to serve upon my appointment as Commissioner, is attached hereto as Exhibit B.

      4.      An undated draft of a subpoena addressed to Gisela Sucre, c/o Citigroup Inc., 390 Greenwich Street, New York, NY 10013, which the Government intends to serve upon my appointment as Commissioner, is attached hereto as Exhibit C.

      5.      An undated draft of a subpoena addressed to Ricardo Braga, c/o Citigroup Inc., 390 Greenwich Street, New York, NY 10013, which the Government intends to serve upon my appointment as Commissioner, is attached hereto as Exhibit D.

      6.      An undated draft of a subpoena addressed to Oxford University Press Inc., Attention: Legal Department, 198 Madison Avenue, New York, NY 10016, which the Government intends to serve upon my appointment as Commissioner, is attached hereto as Exhibit E.

      7.      An undated draft of a subpoena addressed to New York University School of Law, Attention: Legal Department, 70 Washington Square South, Room 1150, New York, NY 10012, which the Government intends to serve upon my appointment as Commissioner, is attached hereto as Exhibit F.

      8.      An undated draft of a subpoena addressed to Citigroup Inc., Attention: Legal Department, 388 Greenwich Street, New York, NY 10013, which the Government intends to serve upon my appointment as Commissioner, is attached hereto as Exhibit G.

      9.      To assist the Argentine Court in obtaining the requested information, I respectfully request that this Court appoint me as Commissioner as proposed in the *ex parte* order attached hereto as Exhibit H. No previous application for the relief sought herein has been made.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

WHEREFORE, the United States respectfully requests that this Court enter the attached Order.

Dated: New York, New York
         July 31, 2014

JESSICA JEAN HU
Assistant United States Attorney

A

1

ERMO DANIEL MASIO
TRADUCTOR PÚBLICO
- INGLÉS
Tº XIII Fº 438
MAT. 4627
C. T. P. C. B. A.

TRADUCCIÓN PÚBLICA.------------------------------------------------------------------

SWORN TRANSLATION.----------------------------------------------------------------

[On the top margin of the first three pages appears a round watermark bearing the legend: "COURT-TO-COURT COMMUNICATIONS AGREEMENT". On the top right corner of the first two pages appears a seal showing the Argentine coat of arms in its center and the legend: "NATIONAL COURT OF FIRST INSTANCE IN LABOR MATTERS – Nº 35"].---------------------

**LETTER ROGATORY**------------------------------------------------------------------

**Court:** National Labor Court Nº 35, Exclusive court office, Autonomous City of Buenos Aires, Argentine Republic.------------------------------------------------------------------

**Judge:** The Hon. Alberto Alejandro Calandrino.------------------------------------------

**Clerk:** Attorney Diego Fernández Madrid.-----------------------------------------------

**Domicile:** Tte. Gral. J.D. Perón 990, piso 7º------------------------------------------------

**Case:** "DE NEVARES, ALEJANDRO C/ CITIBANK N.A. S/ DESPIDO" (Nº 45931/09)-----------

**Parties:** 1. Plaintiff: Alejandro De Nevares (ID 18,109,124), domiciled at Silvio Ruggieri 2935, Piso 32, Dpto. 02 in the City of Buenos Aires.-----------------------------------------------

2. **Defendant:** Citibank N.A. domiciled at 399 Park Avenue, New York City, United States of America.------------------------------------------------------------------

**Nature:** Dismissal------------------------------------------------------------------

**Amount claimed:** U$S3,902,102 and/or (AR$12,096,519)-----------------------------------

**Attorneys:** 1. Acting on behalf of the plaintiff: Juan Manuel Arias.------------------------------

2. Acting on behalf of the defendant: Gaspar A. Aguirre.--------------------------------------

**Authorized parties:** Attorneys Gabriela Cruz Devoto and/or Álvaro J. Galli and/or Alejandro Diego Melfi and/or María Carolina Muriago and/or María Belén Rugeroni and/or Mr. Michael Sirgado, who is domiciled at 77 Water Street, 9th Floor, New York, N.Y. 1005, United States of America, so he can conduct the case in the United States of America and/or whoever they appoint.

**REQUEST**------------------------------------------------------------------

In Buenos Aires, on this 17th day of October, 2012.---------------------------------------------

The Hon. Alberto Alejandro Calandrino, the National Judge of First Instance in Labor Matters charge of National Labor Court Nº 35, in the Autonomous City of Buenos Aires, Argentine Republic.------------------------------------------------------------------

To the Judge with a similar jurisdiction to the one of Your Honor's in the venue of the city of California, United States of America.---------------------------------------------------------

**SUMMARY:**------------------------------------------------------------------

Mr. Alejandro De Nevares performed his duties at the Branch of Citibank NA established in the Argentine Republic from 1st January, 1992 to the month of July, 1994, when he left the Branch of Citibank NA established in the Argentine Republic. On 1st August, 1994 Mr. De Nevares started working as an employee of company Citicorp Capital Markets S.A. where he performed his duties until 4th January, 2004, when he resigned from said job. On 5th January, 2004, Mr. De Nevares was employed by Citibank NA Head Office, Citibank NA, New York, until 11th April, 2007, the date when the employment relationship between the plaintiff and Citibank NA terminated.-----------------

Mr. De Nevares sues Citibank NA (Head Office) claiming the application of the Argentine Labor Laws, to the period during which he performed his duties in the United States of America and to the termination of the employment relationship, which also occurred in the United States of America.



He therefore claims the payment of a compensation for dismissal and the imposition of the fines and aggravated damages set out in the Argentine labor legislation.------------------------------------------------

The Head Office (Citibank NA) answers the complaint arguing that they employed the plaintiff on 5th January, 2004 and assigned him to work at Citibank NA, New York, United States of America. Mr. De Nevares worked in the Head Office until 11th April, 2007, the date of the termination of the employment relationship. Furthermore, said Head Office also states that during the employment of Mr. De Nevares in the United States, his employer was the Head Office of Citibank NA in the United States of America, who paid Mr. De Nevares's salary in accordance with his position, together with the grant of certain benefits. As regards the amounts paid, the Head Office of Citibank NA paid all contributions and duties to the security entities of the United States of America. Also, the Head Office states in its defense that the labor relationship it held with Mr. De Nevares, like its termination, was governed by the legislation of the United States of America, as the employment relationship was started, executed and finished in said territory. Therefore, the Home Office demands the dismissal of the whole claim, arguing that it does not owe the plaintiff any sums whatsoever as, according to the legislation of the United States of America, the position of the plaintiff and the manner in which the employment relationship with Mr. De Nevares terminated, he is not entitled to the payment of any sum at all.------------------------------------------------------------------

Itemized statement of the claims included in the complaint:--------------------------------------------------

Seniority payment--------------------------------------------------U\$S1,158,703-AR\$3,591,979------

Payment in lieu of notice-----------------------------------------U\$S136,318--- AR\$422,586--------

Annual bonus w/o notice--------------------------------------------U\$S11,359----- AR\$35,215----------

Compensation Section 4, Act 25,972----------------------------------U\$S579,351----AR\$1,795,990------

Compensation Section 2, Act 25,323----------------------------------U\$S653,190----AR\$2,024,890------

Compensation Section 1, Act 25,323----------------------------------U\$S1,158,703- AR\$3,591,979------

Compensation Section 80, Contracts of Employment Act-------- U\$S204,477----AR\$633,879--------

TOTAL----------------------------------------------------------- U\$S3,902,102- AR\$12,096,519----

I DO HEREBY GREET, REQUEST AND MAKE KNOWN: That before the National Court of First Instance in Labor Matters N° 35, of the Federal Capital of the Argentine republic, under my charge, exclusive court office in charge of Attorney Diego Fernández Madrid, located at Tte. Gral. J.D. Perón 990, 7th floor, of this capital city, pend the proceedings titled: "**DE NEVARES ALEJANDRO C/ CITIBANK N.A. S/ DESPIDO**" (Docket n° 45931/09), upon which the undersigned has subject matter and territorial jurisdiction and has ordered the issuance of the foregoing letter rogatory to request your cooperation in a discovery proceeding, by setting all the necessary measures tending to request Thomson Reuters, domiciled at 3 Times Square, New York, (NY 10036), United States of America, to inform whether the hereto attached document is a true reproduction of pages 127 to 133 of the book titled: "West's Encyclopedia of American Law".-------

All replies and documents attached to the witness's statement must be translated into Spanish, in a certified translation.-------------------------------------------------------------------------------------------------

The ruling that orders the issuance of the foregoing reads: *"In Buenos Aires, on this 18th day of August, 2012. Also, let notice be served upon the U.S. Supreme Court, the U.S. Department of Justice, New York University School of Law, Oxford University Press Inc, Columbia University School of Law, Thomson Reuters, ABC-CLIO Inc. and Gale Cengage Inc, through a letter rogatory addressed to the corresponding Judge with jurisdiction and competence in the cities of New York, Washington, California and Michigan. These letters rogatory must be drawn and carried out by the*

*defendant, who is hereby instructed to file them for their revision and signing within the term of twenty days, all this under the penalty of said informative evidence being deemed waived. NOTICE BE SERVED."* Signed. JUDGE.------------------------------------------------------------------------------

The following parties are hereby authorized to carry out the foregoing letter rogatory: Attorneys Gabriela Cruz Devoto and/or Pablo Mastromarino and/or Alejandro Diego Melfi and/or Álvaro J. Galli and/or María Carolina Muriago and/or María Belén Rugeroni and/or Mr. Michael Sirgado, the latter domiciled at 77 Water Street, 9th Floor, New York, N.Y. 10005, United States of America.-----
God save Your Honor.------------------------------------------------------------------------------------

[There follow two signatures and two seals which read: "Diego Fernandez Madrid – Clerk" and "ALBERTO A. CALANDRINO – NATIONAL JUDGE"].----------------------------------------------

------------------------------------------------------------------------------------------------------

[The next two pages are joint by an oval seal showing the Argentine coat of arms in its center and the legend: "NATIONAL COURT OF FIRST INSTANCE IN LABOR MATTERS – N° 35"].-----
*The National Judiciary*-----------------------------------------------------------------------------
The undersigned, the Assistant Secretary General of the National Chamber of Labor Appeal of the Federal Capital of the Argentine Republic, hereby certifies that the preceding signature of The Honorable Alberto A. Calandrino is true and matches the one registered in the General Secretariat, in his position as Judge in charge of the National Court of First Instance in Labor Matters N° 35.----
In Buenos Aires, on this 23rd day of October, 2012.------------------------------------------------
[There follows a signature].------------------------------------------------------------------------
**Claudio Riancho**--------------------------------------------------------------------------------
**Assistant Secretary General**-------------------------------------------------------------------
------------------------------------------------------------------------------------------------------

[The pages of the document are hereinafter numbered "1026" to "1031". On the right margin of these pages appear a signature, a seal that reads "ATT. DIEGO FERNANDEZ MADRID – CLERK." and an oval seal showing the Argentine coat of arms in its center and the legend: "NATIONAL COURT OF FIRST INSTANCE IN LABOR MATTERS – N° 35". These pages are in English].------------------------------------------------------------------------------------------

I HEREBY CERTIFY that the foregoing is a true and valid translation into English of the original document in Spanish which I had before me, I attest. In Buenos Aires, on this twenty-first day of February of the year two thousand and thirteen.------------------------------------------------------

ES TRADUCCIÓN FIEL al idioma inglés del document original redactado en el idioma nacional que tuve ante mí y al cual me remito, en Buenos Aires, a los veintiún días del mes de febrero del año dos mil trece.------------------------------------------------------------------------------------

------------------------------------------------------------------------------------------------------

GUILLERMO DANIEL MASIO
TRADUCTOR PÚBLICO
INGLÉS
T° XIII  F° 438
MAT. 4627
C. T. P. C. B. A.

## EXHORTO DIPLOMATICO

**Tribunal:** Juzgado Nacional del Trabajo N° 35, Secretaria Única, Ciudad Autónoma de Buenos Aires, República Argentina.

**Juez:**    Dr. Alberto Alejandro Calandrino.

**Secretario:** Dr. Diego Fernández Madrid.

**Domicilio:** Tte. Gral J. D. Perón 990, piso 7°

**Carátula:** DE NEVARES ALEJANDRO C/ CITIBANK N.A. S/ DESPIDO (N°45931/09).

**Partes:**    1. <u>Actor</u>: Alejandro De Nevares (DNI 18.109.124), domiciliado en Silvio Ruggieri 2935, Piso 32, Dpto. 02 de la Ciudad de Buenos Aires.
2. <u>Demandada</u>: Citibank N.A. domiciliada en 399 Park Avenue, Ciudad de Nueva York, Estados Unidos de América.

**Naturaleza:** Despido

**Monto Reclamado:** U$S3,902,102 (AR$12.096.519)

**Profesionales:**    1. Letrado Patrocinante Actor: Dr. Juan Manuel Arias.
2. Letrado Demandada: Dr. Gaspar A. Aguirre

**Autorizados:** Dres. Gabriela Cruz Devoto y/o Álvaro J. Galli y/o Alejandro Diego Melfi y/o María Carolina Muriago y/o María Belén Rugeroni y/o el Sr. Michael Sirgado, con domicilio en 77 Water Street, Piso 9°, New York, N.Y. 10005, Estados Unidos de Armérica, para que lo diligencie en Estados Unidos de América y/o a quien estos designen.

## EXHORTO

Buenos Aires, 19 de Octubre de 2012.

Doctor Alberto Alejandro Calandrino, Juez Nacional de Primera Instancia en lo Laboral, a cargo del Juzgado Nacional del Trabajo N° 35, Ciudad Autónoma de Buenos Aires, República Argentina.

Al Señor Juez en turno con igual competencia a la de V.S. con jurisdicción en la Ciudad de Nueva York, Estados Unidos de América.

## SUMARIO:

El Sr. Alejandro De Nevares se desempeñó en la Sucursal de Citibank NA establecida en la República Argentina desde el 1° de enero de 1992 hasta el mes de julio de 1994, fecha en que se desvinculó de la Sucursal de Citibank NA establecida en la República Argentina. En el 1° de Agosto de 1994 el Sr. De Nevares ingresó a trabajar como empleado de la empresa Citicorp Capital Markets S.A. hasta el 4 de enero de 2004, fecha en que renunció a dicho empleo. El 5 de enero de 2004, el Sr. De Nevares fue contratado como empleado de la Casa Matriz de Citibank NA, Citibank N.A. New York, hasta el 11 de abril de 2007, fecha en que cesó la relación laboral habida entre el actor y Citibank N.A..

El Sr. De Nevares inicia su demanda contra Citibank NA (Casa Matriz) reclamando la aplicación de la Legislación laboral Argentina, al período durante el cual se desempeñó en los Estados Unidos de América, y a la extinción de la relación laboral, también

ocurrida en los Estados Unidos de América. Solicita, en consecuencia, el pago de las indemnizaciones por despido y la aplicación de multas e indemnizaciones agravadas establecidas en la normativa laboral argentina.

La Casa Matriz (Citibank NA) contesta demanda manifestando que contró al actor como empleado en el 5 de enero de 2004 y que lo asignó a trabajar en Citibank NA New York, Estados Unidos de América. El Sr. De Nevares trabajó en la Casa Matriz hasta el 10 de junio de 2007, fecha en la que se extinguió la relación laboral. Asimismo manifiesta que durante el desempeño del Sr. De Nevares en los Estados Unidos, su empleador fue la Casa Matriz de Citibank NA en los Estados Unidos de América, quien le pagaba al Sr. De Nevares el sueldo de acuerdo a su posición, conjuntamente con el otorgamiento de determinados beneficios. Sobre las sumas abonadas, la Casa Matriz de Citibank NA ingresó todos los aportes y contribuciones a los organismos de seguridad de los Estados Unidos de América, como así también todos los impuestos a las autoridades fiscales de los Estados Unidos de América. Asimismo, la Casa Matriz manifiesta en su contestación de demanda que la relación laboral que mantuvo con el Sr. De Nevares y la extinción de la misma, se rigió por la legislación de los Estados Unidos de América, ya que la relación laboral se inició, ejecutó y se extinguió en su territorio. En consecuencia, la Casa Matriz solicita el rechazo de la demanda en todas sus partes, manifestando que no debe suma alguna al actor, ya que de acuerdo con la legislación de los Estados Unidos de América, el cargo del actor y la forma en la cual se produjo la extinción del vínculo laboral con el Sr. De Nevares, no le corresponde el pago de suma alguna.

Detalle de los conceptos reclamados en la demanda:

| Concepto | | |
|---|---|---|
| Indemnización por antigüedad | U$S1,158,703 | $3.591.979 |
| Indemnización sustitutiva del preaviso | U$S136,318 | $422.586 |
| SAC s/ preaviso | U$S11,359 | $35.215 |
| Indemnización Art. 4, Ley 25.972 | U$S579,351 | $1.795.990 |
| Indemnización Art. 2, Ley 25.323 | U$S653,190 | $2.024.890 |
| Indemnización Art. 1, Ley 25.323 | U$S1,158,703 | $3.591.979 |
| Indemnización Art. 80, LCT | U$S204,477 | $633.879 |
| **TOTAL** | **U$S3,902,102** | **$12.096.519** |

SALUDA, EXHORTA Y HACE SABER: Que por ante el Juzgado Nacional de Primera Instancia del Trabajo N° 35, de la Capital Federal, República Argentina, a mi cargo, secretaría única a cargo de la Dr. Diego Fernández Madrid, sito en Tte. Gral. J.D. Perón 990, piso 7°, de esta capital, tramitan los autos caratulados "DE NEVARES ALEJANDRO C/ CITIBANK N.A. S/ DESPIDO" (Expte. N° 45931/09), en los cuales el suscripto es competente en razón de materia y jurisdicción, ha dispuesto librar la presente rogatoria, a fin de que por su intermedio se solicite a Thomson Reuters, con domicilio en 3 Times Square - New York, NY 10036, Estados Unidos de América, informe si la documentación que se adjunta al presente exhorto es fiel reproducción de las páginas 127 a 133 del libro titulado "West´s Encyclopedia of American Law".

Tanto las respuestas como toda documentación que se adjunte a la declaración del testigo deberá ser previamente traducida al idioma español, mediante traducción pública.

El auto que ordena el libramiento del presente dice: *"Buenos Aires, 18 de agosto de 2011. Asimismo, líbrense los oficios dirigidos a la Corte Suprema de los E.E.U.U., Dpto. de Justicia de los E.E.U.U., New York University School of Law, oxford Univesity Press Inc., Columbia University School of Law, Thomson Reuters, ABC-CLIO Inc. y Gale Cengage Inc. mediante exhorto diplomático al Sr. Juez que corresponda con jurisdicción y competencia en las ciudades de New York, Washington, California y Michigan. Queda a cargo de la parte demandada la confección y diligenciamiento de los exhortos diplomáticos ordenados, por lo que se la intima para que dentro del plazo de veinte días los acompañe para su confronte y firma, todo ello, bajo apercibimiento de tenerla por desistida de dicha prueba informativa. NOTIFIQUESE."* Fdo. JUEZ.

Quedan autorizados para el diligenciamiento del presente exhorto, los Dres. Gabriela Cruz Devoto y/o Pablo Mastromarino y/o Alejandro Diego Melfi y/o Álvaro J. Galli y/o María Carolina Muriago y/o María Belén Rugeroni y/o Michael Sirgado, éste último, con domicilio en 77 Water Street, Piso 9°, New York, NY 10005, Estados Unidos de América.

Dios guarde a V.S.

Dr. Diego Fernandez Madrid
Secretario

Dr. ALBERTO A. CALANDRINO
JUEZ NACIONAL



## *Poder Judicial de la Nación*

 El que  suscribe, Prosecretario General de la Cámara Nacional de Apelaciones del Trabajo de la Capital Federal de la República Argentina, certifica que la firma que antecede del Doctor Alberto A. Calandrino  es auténtica  y coincide con la que figura registrada en la Secretaría General, en su carácter de Juez a cargo del Juzgado Nacional de Primera Instancia del Trabajo Nº  35

.................................……………………..Buenos Aires, 23 de octubre de 2012........

**Claudio Riancho**
Prosecretario General

JANIEL MASIO
OR PÚBLICO
GLÉS
III F° 438
IT. 4627
. P.C. B. A.

THE *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Sworn translators association of the city of Buenos Aires) pursuant to 20305 act, section 10, subsection d, hereby certifies that the signature and the seal on the translation attached hereto match the signature and seal of the Sworn Translator (Traductor Público) in our files.

THIS CERTIFICATION IS NOT VALID WITHOUT THE PERTINENT CONTROL STAMP ON THE LAST PAGE OF THE TRANSLATION ATTACHED HERETO.

Vu par le *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Ordre de Traducteurs Officiels de la ville de Buenos Aires), en vertu des attributions que lui ont été accordées par l'article 10, alinéa d) de la Loi nº 20.305, pour la seule légalisation matérielle de la signature et du sceau du Traductor Público (Traducteur Officiel) apposés sur la traduction du document ci-joint, qui sont conformes à ceux déposés aux archives de cette Institution.

LE TIMBRE APPOSÉ SUR LA DERNIÈRE PAGE DE LA TRADUCTION FERA PREUVE DE LA VALIDITÉ DE LA LÉGALISATION.

Con la presente il *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Collegio dei Traduttori Giurati della Città di Buenos Aires) ai sensi della facoltà conferitagli dall'articolo 10, comma d), della Legge 20.305, CERTIFICA, esclusivamente, la firma ed il timbro del Traductor Público (Traduttore Giurato), apposti in calce alla qui unita traduzione, in conformità alla firma ed al timbro depositati nei propri registri.

LA PRESENTE LEGALIZZAZIONE SARÀ PRIVA DI VALIDITÀ OVE NON VENGA TIMBRATA NELL' ULTIMO FOGLIO DELLA TRADUZIONE.

Através da presente, o *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Colégio de Tradutores Públicos da Cidade de Buenos Aires), no uso de suas atribuições, de conformidade com o artigo 10, alínea "d", da Lei 20.305, certifica unicamente que a assinatura e o carimbo do Traductor Público (Tradutor Público) que subscreve a tradução anexa conferem com a assinatura e o carimbo arquivados nos registros desta instituição.

A PRESENTE LEGALIZAÇÃO SÓ SERÁ CONSIDERADA VÁLIDA COM A CORRESPONDENTE CHANCELA MECÂNICA APOSTA NA ÚLTIMA FOLHA DA TRADUÇÃO

BEGLAUBIGUNG. Der *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Kammer der Vereidigten Übersetzer der Stadt Buenos Aires), kraft der Befugnisse, die ihr nach Artikel 10, Abs.d) des Gesetzes 20.305 zustehen, bescheinigt hiermit lediglich die Übereinstimmung der Unterschrift und des Siegelabdruckes auf der beigefügten Übersetzung mit der entsprechenden Unterschrift und dem Siegelabdruck des Traductor Público (VereidigtenÜbersetzers), die in den Registern dieser Institution hinterlegt worden sind.

DIESE BEGLAUBIGUNG IST NICHT GÜLTIG OHNE DEN ENTSPRECHENDEN GEBÜHRENSTEMPEL AUF DEM LETZTEN BLATT DER BEIGEFÜGTEN ÜBERSETZUNG.



# COLEGIO DE TRADUCTORES PÚBLICOS
# DE LA CIUDAD DE BUENOS AIRES

REPÚBLICA ARGENTINA
LEY 20.305

## LEGALIZACIÓN

Por la presente, el *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES*,

en virtud de la facultad que le confiere el artículo 10, inc.d) de la ley 20.305, certifica únicamente que

la firma y el sello que aparecen en la traducción adjunta concuerdan con los correspondientes

al/la Traductor/a Público/a MASIO, GUILLERMO DANIEL

que obran en los registros de esta institución en el folio 438 del Tomo 13 en el idioma INGLES

Legalización Número:   16622

Buenos Aires, 19/03/2013

MARCELO F. SIGALOFF
Gerente de Legalizaciones
Colegio de Traductores Públicos
de la Ciudad de Buenos Aires

<u>ESTA LEGALIZACIÓN NO SE CONSIDERARÁ VÁLIDA SIN EL CORRESPONDIENTE
TIMBRADO DE CONTROL EN LA ÚLTIMA HOJA DE LA TRADUCCIÓN ADJUNTA</u>

Control Interno: 15561716622

Av. Corrientes 1834 - C1045AAN - Ciudad Autónoma de Buenos Aires - 4373-7173 y líneas rotativas

102 C

EL MASIO
ÚBLICO
3
438
527
B. A.



DR. DIEGO FERNANDEZ MADRID
SECRETARIO

# WEST'S ENCYCLOPEDIA *of* AMERICAN LAW

## 2ND EDITION

### VOLUME 4

DOU TO FRE

INFORMATION SOURCE
CENTER

**THOMSON**
—✳—
**GALE**

Detroit • San Diego • San Francisco • New Haven, Conn. • Waterville, Maine • London • Munich





THOMSON
━━━━━━✳━━━━━━
GALE

West's Encyclopedia of American Law, 2nd Edition

**Project Editors**
Jeffrey Lehman
Shirelle Phelps

**Editorial**
Andrew C. Claps, Pamela A. Dear, Jason M. Everett, Lynn U. Koch, John F. McCoy, Jeffrey Wilson, Jennifer M. York, Ralph Zerbonia

**Research**
Barbara McNeil

**Editorial Support Services**
Ryan Cartmill, Mark Hefner, Sue Petrus

**Data Capture**
Katrina Coach, Nikita Greene, Beverly Jendrowski, Elizabeth Pilette, Beth Richardson

**Indexing Services**
Lynne Maday

**Permissions**
Margaret A. Chamberlain

**Imaging and Multimedia**
Dean Dauphinais, Leitha Etheridge-Sims, Mary Grimes, Lezlie Light, Dan Newell, David G. Oblender, Chris O'Bryan

**Product Design**
Cynthia Baldwin, Kate Scheible

**Composition and Electronic Capture**
Evi Seoud, Mary Beth Trimper

**Manufacturing**
Rhonda Williams

© 2005 Thomson Gale, a part of The Thomson Corporation.

Thomson and Star Logo are trademarks and Gale is a registered trademark used herein under license.

*For more information, contact*
The Gale Group, Inc.
27500 Drake Rd.
Farmington Hills, MI 48331-3535
Or you can visit our Internet site at
http://www.gale.com

ALL RIGHTS RESERVED
No part of this work covered by the copyright hereon may be reproduced or used in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, Web distribution, or information storage retrieval systems—without the written permission of the publisher.

This publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair condition, and other applicable laws. The authors and editors of this work have added value to the underlying factual material herein through one or more of the following: coordination, expression, arrangement, and classification of the information.

For permission to use material from this product, submit your request via Web at http://www.gale-edit.com/permission or you may download our Permissions Request form and submit your request by fax of mail to:

*Permissions Department*
The Gale Group, Inc.
27500 Drake Rd.
Farmington Hills, MI 48331-3535
Permissions Hotline:
248-699-8006 or 800-877-4253, ext. 8006
Fax: 248-699-8074 or 800-762-4058

Inside cover photograph reproduced by permission of the Library of Congress (Thurgood Marshall).

Since this page cannot legibly accommodate all copyright notices, the acknowledgments constitute an extension of the copyright notice.

While every effort has been made to ensure the reliability of the information presented in this publication, The Gale Group, Inc. does not guarantee the accuracy of the data contained herein. The Gale Group, Inc. accepts no payment for listing; and inclusion in the publication of any organization, agency, institution, publication service, or individual does not imply endorsement of the editors or publisher. Errors brought to the attention of the publisher and verified to the satisfaction of the publisher will be corrected in future editions.

Library of Congress Cataloging-in-Publication Data

West's encyclopedia of American law / Jeffrey Lehman, editor, Shirelle Phelps, editor.— 2nd ed.
 p. cm.
 Includes bibliographical references and index.
 ISBN 0-7876-6367-0 (hardcover set : alk. paper)
 1. Law—United States—Encyclopedias. 2. Law—United States—Popular works. I. Lehman, Jeffrey. II. Phelps, Shirelle.
 KF154.W47 2004
 349.73'03—dc22                                    2004004918

ISBN 0-7876-6367-0 (set), ISBN 0-7876-6368-9 (vol. 1), ISBN 0-7876-6369-7 (vol. 2), ISBN 0-7876-6370-0 (vol. 3), ISBN 0-7876-6371-9 (vol. 4), ISBN 0-7876-6372-7 (vol. 5), ISBN 0-7876-6373-5 (vol. 6), ISBN 0-7876-6374-3 (vol. 7), ISBN 0-7876-6375-1 (vol. 8), ISBN 0-7876-6376-X (vol. 9), ISBN 0-7876-6377-8 (vol. 10), ISBN 0-7876-6378-6 (vol. 11), ISBN 0-7876-6379-4 (vol. 12), ISBN 0-7876-9420-7 (vol. 13)

This title is also available as an e-book. ISBN 0-7876-9373-1 (set)
Contact your Gale sales representative for ordering information.

Printed in the United States of America
10 9 8 7 6 5 4 3 2 1

WORKERS' COMPENSATION laws abrogate the principle of COMMON LAW that an employer is not liable to employees who have been injured by the fault or NEGLIGENCE of a fellow worker during the course of employment.

## EMPLOYMENT AT WILL

*A common-law rule that an employment contract of indefinite duration can be terminated by either the employer or the employee at any time for any reason; also known as terminable at will.*

Traditionally, U.S. employers have possessed the right to discharge their employees at will for any reason, be it good or bad. The "at-will" category encompasses all employees who are not protected by express employment contracts that state that they may be fired only for good cause. "Good cause" requirements are typically a part of collective bargaining agreements negotiated by employee unions; nonunion workers rarely have this form of protection. The at-will doctrine also does not apply to contracts for a specified term, such as an employment contract that contemplates the employee providing service for a expressly designated number of years.

The United States is the only major industrial power that maintains a general employment-at-will rule. Canada, France, Germany, Great Britain, Italy, Japan, and Sweden all have statutory provisions that require employers to show good cause before discharging employees.

Beginning in the 1980s, employment at will came under challenge in the United States. Employees had grown increasingly dissatisfied with the rule for a variety of reasons. For one thing, a decline in the number of self-employed individuals—due, in part, to a continuing decline in the number of farmers—meant that most U.S. citizens worked for someone else. For another, a typical worker who was discharged currently lost more than in the past in terms of PENSION, insurance, and other benefits.

As a result, a greater number of discharged workers brought suits alleging WRONGFUL DISCHARGE from employment. By the 1980s, as concepts of job security expanded, employees became increasingly successful in such suits. In 1987, California juries ruled in favor of the employees in over two-thirds of such cases and granted an average award of $1.5 million. In some successful cases, the courts have created exceptions to the employment-at-will practice. Thus far, these exceptions have fallen into three



*U.S. employers, such as the owners of this candy manufacturing plant, have the right to discharge employees at will for any reason under the common-law rule of employment at will.*
APWIDE WORLD PHOTOS

broad categories: (1) breach of contract by the employer, (2) breach of an implied COVENANT of GOOD FAITH and fair dealing, and (3) violation of public policy by the employer. Employers and legislatures have responded in a variety of ways.

### Breach of Contract

Approximately half of the states have allowed exceptions to employment at will on the basis of an express or implied promise by the employer. Typically, a wrongful discharge action alleging the breach of an employer's promise is based on a statement by the employer that expressly or implicitly promises employees a degree of job security. Ordinarily, such statements are found in employee handbooks or in policy memorandums given to employees when they are hired. Some courts have interpreted such statements as unilateral contracts in which the employer promises not to discharge the employees except for JUST CAUSE and in accordance with certain procedures (*Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 106 Ill. Dec. 8, 505 N.E.2d 314 [Ill. 1987]). Courts were more reluctant to find exceptions to the employment-at-will practice in cases that involved an oral promise of long-term employment.

### Breach of an Implied Covenant of Good Faith and Fair Dealing

In wrongful dismissal cases based on an implied covenant of good faith and fair dealing, the discharged employee typically contends that the employer has indicated in various ways that the employee has job security

and will be treated fairly. For example, long time employees who have consistently received favorable evaluations might claim that their length of service and positive performance reviews were signs that their job would be secure as long as they performed satisfactorily.

Courts that have recognized good-faith-and-fair-dealing exceptions have found either covenants implied in fact or covenants implied in law. Covenants implied in fact have been found in "objective manifestations," including repeated promotions and pay increases, that might reasonably give an employee cause to believe that he or she has job security and will be treated fairly (*Dare v. Montana Petroleum Marketing*, 687 P.2d 1015 [Mont. 1984]; *Kerr v. Gibson's Products Co.*, 733 P.2d 1292 [Mont. 1987]).

A few jurisdictions have recognized implied-in-law covenants of good faith and fair dealing. California courts have ruled that every employment contract carries with it an implied covenant that neither party will impede the other from receiving the benefits of the agreement. In deciding whether such a covenant is to be inferred, a court looks at such factors as whether the company properly followed its stated personnel policies, the length of the person's employment, any job security assurances that may have been made, a presence or lack of prior criticism of performance, and basic notions of fairness.

In *Khanna v. Microdata Corp.*, 170 Cal. App. 3d 250, 215 Cal. Rptr. 860 (1985), for example, a California court of appeals ruled that a company violated an implied covenant when it fired a leading salesman who had brought suit against the company for unpaid commissions. The court found that a breach of an implied-in-law covenant is established whenever an employer engages in a bad-faith action outside a contract and attempts to frustrate an employee's enjoyment of her or his contract rights.

### Violation of Public Policy

Several public policy exceptions to the employment-at-will practice have been recognized by courts in some jurisdictions. In public policy cases, the employee alleges that he or she has been discharged in violation of a policy found in a statutory right of the employee, statutes containing penalties, constitutional provisions, and judicial opinions. Courts have generally been more willing to recognize a public policy exception when the policy in question has a statutory basis than when it does not.

Courts in many jurisdictions have been willing to recognize public policy exceptions for employees who were discharged because they asserted a statutory right. For example, in *Firestone Textile Co. Division, Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730 (1983), the Supreme Court of Kentucky ruled that an employer could not discharge an employee simply because he had filed a workers' compensation claim.

A public policy exception to employment at will has also been found in cases where an employee was fired for refusing to violate a statute. Wrongful discharge has been found in instances where employees were dismissed for refusing to dispose of waste in a place where doing so is prohibited by law, for refusing to commit perjury, and for giving testimony in compliance with a court order.

Courts have much less frequently been willing to recognize exceptions to employment at will owing to constitutional provisions. Nevertheless, in *Novosel v. Nationwide Insurance Co.*, 721 F.2d 894 (3d Cir. 1983), a federal appeals court made a public policy exception for an employee who was dismissed for refusing to join a company's LOBBYING effort because he privately opposed the company's stance on the issue. The court found that the free speech provisions of the Pennsylvania Constitution and the U.S. Constitution's FIRST AMENDMENT protected the employee's refusal. In *Borse v. Piece Goods Shop*, 963 F.2d 611 (1992), a federal circuit court of appeals ruled that Pennsylvania law may protect at-will employees from being fired for refusing to take part in drug-testing programs if the employees' privacy is unreasonably invaded.

### The Response by Employers and Legislatures

Legal guidelines relating to the status of employment at will are still developing or remain unclear in many states. The evolving judgments of legislatures and courts on this issue reflect a continuing debate over how to protect wrongfully discharged at-will employees while allowing employers the freedom to make personnel decisions.

The rising number of wrongful-dismissal suits has alarmed many employers. Faced with the threat of high legal fees, court costs, and huge potential damage awards in such cases, more companies have begun to add express employment-at-will clauses to employment

contracts. Many employers have deleted poten-tially troublesome statements from their hand-books and instructed recruiters to make no promises about just cause or the term of employment. Companies are also turning more frequently to severance pay settlements, in which discharged employees receive a reason-ably generous compensation package in exchange for waiving all future claims based on the employment or its termination.

The decline of the power of employee unions and COLLECTIVE BARGAINING has pro-vided many employers with the freedom to insert the new contract clauses. In many instances, companies are concerned more with losing expensive termination lawsuits than with inciting union action or public boycotts.

Whereas employers claim they are simply reasserting their rights under the traditional at-will doctrine, employee advocates believe that many companies may be attempting to cheat workers out of the job security gains they have achieved through several decades of wrongful-dismissal lawsuits. They propose legislation that would protect at-will employees from unjust dis-charge and provide for arbitrators to handle dis-putes. This solution, they suggest, would be fair to employees and employers alike. Such legisla-tion would protect at-will employees, not just those who fall under the exceptions and who can afford to pursue a lawsuit that may take years to complete. Businesses would benefit not only because employee morale might improve, but also because relief could be limited to back pay and reinstatement rather than possibly including punitive and COMPENSATORY DAMAGES.

Some state legislatures have enacted legisla-tion that struggles to balance the rights of the employee and the employer. In 1987, Montana passed the Montana Wrongful Discharge from Employment Act (Mont. Code Ann. § 39-2-901). This law limits the rights of employees claiming wrongful discharge, by restating the principle that at-will employees may be dismissed for "any reason considered sufficient by the terminating party." However, a discharge could be considered wrongful even under this principle if it was in retaliation for the employee's refusal to violate public policy, if it was not for good cause, or if the employer violated the express provisions of the employer's own personnel policy.

The Montana statute limits the remedies of a discharged employee who sues the former employer. The employee may be awarded lost

wages and fringe benefits but only for a period not to exceed four years, and PUNITIVE DAM-AGES may be sought only when there is clear and convincing evidence that the employer engaged in actual FRAUD or malice in the wrongful dis-charge. In addition, any earnings that were or could have been accrued following the discharge must be deducted from the amount awarded in lost wages. The Montana Supreme Court upheld the constitutionality of the act in *Meech v. Hill-haven West*, 776 P.2d 488 (1989).

FURTHER READINGS

Covey, Anne. 2000. *Workplace Law Advisor: From Harass-ment and Discrimination Policies to Hiring and Firing Guidelines—What Every Manager and Employee Needs to Know.* Cambridge, Mass.: Perseus.

Joel, Lewin G., III. 1993. *Every Employee's Guide to the Law: Everything You Need to Know about Your Rights in the Workplace—and What To Do If They Are Violated.* New York: Pantheon.

Park, Sandra S. 2003. "Working Towards Freedom from Abuse: Recognizing a 'Public Policy' Exception to Employment-At-Will for Domestic Violence Victims." *New York University Annual Survey of American Law* 59 (spring): 121–62.

Rudy, Jesse. 2002. "What They Don't Know Won't Hurt Them: Defending Employment-At-Will in Light of Findings that Employees Believe They Possess Just Cause Protection." *Berkeley Journal of Employment and Labor Law* 23 (winter): 307.

CROSS-REFERENCES

Covenant; Employment Law; Fraud; Good Faith; Malice.

## EMPLOYMENT LAW

*The body of law that governs the employer-employee relationship, including individual employment contracts, the application of* TORT *and contract doctrines, and a large group of statu-tory regulation on issues such as the right to organize and negotiate collective bargaining agreements, protection from discrimination, wages and hours, and health and safety.*

Beyond establishing an economic relation-ship between employer and employee, work provides a powerful structure for organizing social and cultural life. The employment rela-tionship is more than the exchange of labor for money. In U.S. society, self-worth, dignity, satis-faction, and accomplishment are often achieved by one's employment responsibilities, perform-ance, and rewards. The development of employ-ment law demonstrates the importance of work. Since the 1930s, employees have acquired more legal rights as federal and state governments



# Company Obligations to Work-at-Home Employees

The purpose of the OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970 (OSH Act), 29 U.S.C.A. §§ 651 et seq, is to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." (Section 2(b)). The OSH Act applies to a private employer who has any employees doing work in a workplace in the United States. It requires these employers to provide employment and a place of employment that are free from recognized, serious hazards, and to comply with Occupational Safety and Health Act (OSHA) standards and regulations (Sections 4 and 5 of the OSH Act). By regulation, OSHA does not cover individuals who, in their own residences, employ persons for the purpose of performing domestic household tasks.

OSHA has never conducted inspections of home offices, and such an inspection would, in fact, be contrary to OSHA policy. OSHA will not hold employers liable for employees' home offices and does not expect employers to inspect the home offices of their employees. If OSHA receives a complaint about a home office, the complainant will be advised of OSHA policy. If an employee makes a specific request, OSHA may informally let employers know of complaints about home office conditions but will not follow-up with the employer or employee.

OSHA will, however, conduct inspections of other home-based worksites, such as home manufacturing operations, when OSHA receives a complaint or referral that indicates that a violation of a safety or health standard exists that threatens physical harm or that an imminent danger exists, including reports of a work-related fatality. The scope of the inspection in an employee's home will be limited to the employee's work activities. Employers are responsible in home worksites for hazards caused by materials, equipment, or work processes which the employer provides or requires to be used in an employee's home.

In April 2001 the Bush administration announced plans to call for an amendment to the Occupational Safety and Health Act to preclude home office inspections when employees primarily work on the telephone, computer, and/or with other electronic devices. As part of the administration's larger New Freedom Initiative, the move was intended to help disabled workers buy computers and other equipment needed to work at home, without OSHA intervention, in return for tax incentives to encourage employers to provide such equipment.

FURTHER READINGS

Bureau of National Affairs. 1975. *Occupational Safety and Health Cases.* Washington, D.C.: Bureau of National Affairs.

Lave, Lester B. 1982. *Quantitative Risk Assessment in Regulation.* Washington, D.C.: Brookings Institute.

Lofgren, Don J. 1989. *Dangerous Premises: An Insider's View of OSHA Enforcement.* Ithaca, N.Y.: Cornell Univ. Press.

CROSS-REFERENCES

Occupational Safety and Health Act of 1970.

have enacted laws that give them the power and authority to unionize, to engage in COLLECTIVE BARGAINING, and to be protected from discrimination based on race, gender, or disability.

## History

English COMMON LAW, and subsequently early U.S. law, defined the relationship between an employer and an employee as that of MASTER AND SERVANT. The master-and-servant relationship arose only when the tasks performed by the servant were under the direction and control of the master and were subject to the master's knowledge and consent.

With the rise of industrialization and mass production in the 1800s, the U.S. economic structure changed dramatically. Employers needed masses of employees to run the equipment that produced capital and consumer goods. By the end of the nineteenth century, the U.S. economy was attracting millions of immigrants. In addition, migration from country to city accelerated.

Nineteenth-century employment law was based on the concept of liberty of contract: a worker had the freedom to bargain with an employer for terms of employment. This concept was challenged when workers organized into unions and engaged employers in collective bargaining. The U.S. legal and economic systems at the time were opposed to the idea of collective bargaining. Union organizers noted the inequality of bargaining power between a prospective employee and an employer.

Judges were hostile to attempts by state governments to regulate the hours and wages of employees. In LOCHNER V. NEW YORK, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905), the U.S. Supreme Court, on a 5–4 vote, struck down a New York State law (N.Y. Laws 1897, chap. 415, art. 8, § 110) that specified a maximum 60-hour week for bakery employees. The Court ruled that the law was a "meddlesome interference" with business, concluding that the regulation of work hours was an unjustified infringement on "the right to labor, and with the right of freedom of contract on the part of the individual, either as employer or employee."

The U.S. labor movement's persistent attempts to break free of the freedom-of-contract doctrine ultimately led to major changes in employment law. The NEW DEAL era of the 1930s brought federal recognition of the right of workers to organize themselves as unions and to bargain collectively with management. The passage of the WAGNER ACT, also known as the National Labor Relations Act of 1935 (29 U.S.C.A. § 151 et seq.), established these rights and also proscribed UNFAIR LABOR PRACTICES (i.e., actions taken by employers that interfere with the union rights of employees). The act also established the NATIONAL LABOR RELATIONS BOARD, a federal ADMINISTRATIVE AGENCY, to administer and enforce its provisions.

Since the 1950s, the federal government has led the way in providing employees more rights concerning the employment relationship.

## Physical Safety

Federal and state statutes regulate workplace hazards to avoid or minimize employee injury and disease. These laws concern problems such as dangerous machinery, hazardous materials, and noise. A more recent trend has been the banning of smoking in the workplace. All of these laws place the burden on employers to maintain a safe and healthy workplace.



*Employees photographed in a Troy, New York, shirt factory around 1907, a time when many employees were hired under the concept of liberty of contract.*
RARE BOOKS AND SPECIAL COLLECTIONS DIVISION, LIBRARY OF CONGRESS

The federal government's main tool in workplace safety is the OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970 (OSHA) (29 U.S.C.A. §§ 651–678 [1988]). OSHA attempts to balance the employee's need for a safe and healthy working environment against the employer's desire to function without undue government interference. OSHA issues occupational safety and health standards, and employers must meet these standards or face civil and, in rare occurrences, criminal penalties.

When an employee is injured on the job, the employee may file a compensation claim with the state WORKERS' COMPENSATION system. Prior to WORLD WAR I, an injured employee had to sue his or her employer in state court, alleging a tort violation. This avenue rarely proved successful, as employees were reluctant to testify about work conditions and thus risk the possible loss of their job. Without witnesses, an employee had little chance of recovery. In addition, employers were protected by legal defenses to NEGLIGENCE that usually allowed them to escape liability.

Dissatisfaction with this situation led the states to enact workers' compensation laws, which set up an administrative process for compensating employees for work-related injuries. These systems provide compensation while a worker is physically unable to work (i.e., temporary disability), provide retraining if the employee can no longer perform the same job, and provide compensation indefinitely if the worker has been severely injured (i.e., total disability). Medical benefits are paid for treatment of work-related injuries. Depending on the state, employers fund this system by making state-regulated contributions to a workers' compensation insurance fund, paying insurance

premiums to a private insurance company, or assuming the risk through self-insurance.

## Discrimination

Since the 1960s, employment law has changed most radically in the protection that it gives employees against discrimination in the workplace. Although the federal government banned RACIAL DISCRIMINATION in the making of contracts in the CIVIL RIGHTS ACTS of 1870 and 1871 (42 U.S.C.A. §§ 1981, 1983), the federal courts narrowly construed the provisions to prevent their being used in the employment context. Not until the 1970s did federal courts allow these provisions to be applied to complaints of discrimination by individual employees (*McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S. Ct. 2574, 49 L. Ed. 2d 493 [1976]).

Federal legislation in the 1960s provided employees with more avenues to challenge alleged discrimination. The 1963 Equal Pay Act (29 U.S.C.A. § 216 (d)) requires employers to pay men and women equal wages for equal work. The CIVIL RIGHTS ACT OF 1964 (42 U.S.C.A. § 2000e et seq.) contains broad prohibitions against discrimination on the basis of race, color, religion, national origin, or sex. Discrimination against persons ages 40 and over was banned in 1967 by the Age Discrimination in Employment Act (29 U.S.C.A. § 621 et seq.).

Major amendments to the general civil rights acts were passed in 1972, extending coverage to federal and state employees; in 1978, clarifying the protection of pregnant women; and in 1991, overruling a series of decisions by the U.S. Supreme Court that had restricted the reach of antidiscrimination statutes.

In 1990, Congress passed the Americans with Disabilities Act (ADA) (42 U.S.C.A. § 12101 et seq.), forbidding discrimination against qualified individuals with disabilities and requiring reasonable efforts to accommodate persons with disabilities in some situations.

With the growth of federal antidiscrimination statutes, many states have passed laws banning employment discrimination. A number of cities have enacted their own programs, as well. Some states and cities address issues that are not covered by the federal statutes, such as discrimination on the basis of sexual orientation.

## Termination of Employment

Historically, employment law has limited an employee's right to challenge an employer's unfair, adverse, or damaging practices. The law has generally denied any redress to an employee who is arbitrarily treated, unless the employee is represented by a union or has rights under a written employment contract. Absent these two conditions, or a statutory provision, the general rule has been that an employer or an employer can terminate the employment relationship at any time, for any or no reason, with or without notice. This rule forms the core of the "at-will" employment doctrine.

The at-will doctrine was articulated and refined by state courts in the 1800s. It provided employers with the flexibility to control the workplace by terminating employees as economic demand slackened. For employees, it provided a simple way of leaving a job if a better employment prospect became available or if working conditions were intolerable.

Courts and legislatures have modified the at-will employment doctrine. A public policy exception recognizes that an employee should not be terminated because he or she refused to act in an unlawful manner, attempted to perform a duty prescribed by statute, exercised a legal right, or reported unlawful or improper employer conduct ("whistle-blowing").

At-will employees may be protected even if no written contract exists. Many state courts now recognize employee rights that are contained in personnel policies or employee handbooks. As businesses grow larger, formal rules and procedures are needed in order to streamline administrative issues. A handbook or employment-policy manual usually contains rules of expected employee behavior, disciplinary or termination procedures that apply if the rules are violated, and compensation and benefit information. An employer must follow the rules for firing an employee that are set out in the handbook or manual, or risk a lawsuit for wrongful termination.

If an employer terminates an employee, the employer must be prepared to show "good cause" for the firing. With the many statutes that forbid discrimination in the workplace, the employer has the burden of showing a nondiscriminatory reason. Good cause can include inadequate job performance, job-related misconduct, certain types of off-the-job conduct, and business needs.

## Privacy and Reputation

When an individual seeks employment, he or she surrenders some privacy rights. To become employed, the individual will be asked

to disclose personal information and may be required to submit to continuing evaluation. Current or prospective employees may be asked to submit to a physical examination, a POLY-GRAPH examination, a psychological evaluation, a test for use of illegal drugs, or a test for HIV. Employers have the right to search lockers or to frisk employees even if no reasonable suspicion of theft exists. The modern workplace can be checked by an employer through the monitoring of phone lines and personal computers.

Courts and legislatures have expressed increasing concern about the improper use of information that employers collect on employees. Employers who distribute information more widely than necessary, reveal confidential medical or personal information about an employee, or intrude on an employee's personal, off-work behavior risk lawsuits for invasion of privacy.

The issue of DEFAMATION also affects employment law. Defamation is subdivided into the torts of LIBEL, which involves a writing, and slander, which involves speech. Liability for defamation may be imposed if an employer makes a statement about an employee that is false and hurts the reputation of the employee. Employers have been successfully sued for defamation for communicating unfavorable job recommendations about a former employee. As a result, employers are reluctant to give more than basic employment history when asked for a job reference. Twenty-five states have enacted "good faith" job-reference laws, which protect employers who divulge employee job-performance information to a prospective employer.

**Wage and Hour Regulations**

The FAIR LABOR STANDARDS ACT (FLSA) (29 U.S.C.A. § 201 et seq.) imposes minimum-wage standards and overtime standards on most employers. The minimum hourly wage is a means of ensuring that a full-time worker can maintain a minimum standard of living. Overtime standards mandate that an employer pay employees at least time and a half for working more than eight hours per day. The FLSA does not pre-empt states or localities from setting a higher MINIMUM WAGE. An employer operating in a state or locality with a higher minimum wage than that set by the FLSA must abide by the higher standard.

**Employee Retaliation**

In *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (U.S. Md., Feb 18,



**Employment Law**
CIVILIAN LABOR FORCE PARTICIPATION RATES, 1980–2000

SOURCE: U.S. Bureau of Labor Statistics.

1997) (NO. 95-1376), a former employee sued Shell Oil after he was fired. Robinson filed an employment-discrimination charge with the EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC) under Title VII of the Civil Rights Act of 1964. While that charge was pending, he applied for a job with another company, which contacted the respondent for an employment reference. Claiming that respondent gave him a negative reference in retaliation for his having filed the EEOC charge, Robinson filed suit under §704(a) of Title VII, which makes it unlawful for an employer to discriminate against any of his employees or applicants for employment who have availed themselves of Title VII's protections. The U.S. Supreme Court held that the term "employees," as used in §704(a) of Title VII, does include former employees, and so Robinson could sue for the allegedly retaliatory post employment actions.

In *Haddle v Garrison,* 525 U.S. 121, 119 S.Ct. 489, 142 L.Ed.2d 502 (U.S.Ga., Dec 14, 1998) (NO. 97-1472), Petitioner Michael Haddle cooperated with federal agents in an investigation

that lead to the indictment of his employer, Healthmaster, Inc. and respondents Jeanette Garrison and Dennis Kelly for MEDICARE FRAUD. Haddle was subpoenaed to testify before the GRAND JURY, and although he did appear, he did not testify, due to time constraints. Additionally, Haddle was expected to appear as a witness in the criminal trial resulting from the indictment. Garrison and Kelly subsequently conspired with a remaining Healthmaster officer to have Haddle fired, both in retaliation for assisting with the federal proceedings, and also to intimidate him. Haddle then sued for damages under 42 U.S.C. §1985(2) (which prohibits conspiracies to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified), alleging a conspiracy to intimidate him from testifying in the upcoming criminal trial, and a conspiracy to retaliate against him for appearing before the grand jury. Garrison and Kelly moved to dismiss for FAILURE TO STATE A CLAIM upon which relief can be granted because §1985 requires that complainants allege an injury in their person or property in order to recover damages. Under the authority of an earlier case, the U.S. Court of Appeals for the Eleventh Circuit accepted the respondents' argument that because Haddle was an at-will employee, he had no constitutionally protected interest in continued employment, and therefore could not allege an injury. The U.S. Supreme Court rejected the Eleventh Circuit's position that there must be injury to a "constitutionally protected property interest" to state a claim for damages under §1985. Section 1985 is intended to redress intimidation or retaliation against witnesses in federal court proceedings. Limiting causes of action under the statute to restoration of property misses the point and improperly limits the statute's effect. Instead, the Court analyzed "injured in his person or property" in the context of tort-law, which recognizes third-party interference with at-will employment as a breed of the traditional tort of intentional interference with contractual relations and intentional interference with prospective contractual relations.

The U.S. Equal Employment Opportunity Commission (EEOC) has issued comprehensive guidance on the prohibition against retaliation aimed at individuals who file charges of employment discrimination or who participate in the investigation of an EEOC charge.

## Pensions and Other Employee Benefits

The federal government regulates employee benefit plans under the EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA), 29 U.S.C.A. § 1001 et seq., passed in 1974. Title I of the act (29 U.S.C.A. § 1011 et seq.) provides rules with respect to participation, vesting and funding of benefits plans, fiduciary responsibility, reporting and disclosure, and administration and enforcement. Title II contains tax law provisions as amendments to the INTERNAL REVENUE CODE of 1954 (26 U.S.C.A. § 401 et seq.). Title III concerns jurisdiction, administration, and enforcement (29 U.S.C.A. § 1201 et seq.). Title IV creates the PENSION Benefit Guaranty Corporation and establishes a system of employee-plan-termination insurance (29 U.S.C.A. § 1301 et seq.).

ERISA does not require an employer to provide employee-benefit plans. However, if an employer sets up a qualified plan (i.e., one that meets ERISA's standards), the employer may take a tax deduction for the employer's contribution. The employer also may deduct the full amount of an employee group-health plan that meets tax code standards.

The Family and Medical Leave Act of 1993 (FAMLA) (29 U.S.C.A. § 2601 et seq.) establishes the right of employees to take unpaid leave for family reasons. FAMLA applies to employers of 50 persons or more. It entitles an employee to take up to 12 weeks of leave during a 12-month period because of the birth of a child to the employee, the placement of a child with the employee for ADOPTION or foster care, the serious health condition of a family member of the employee, or the employee's own serious health condition.

CROSS-REFERENCES

Age Discrimination; Civil Rights; Disability Discrimination; E-Mail; Employment at Will; Gay and Lesbian Rights; Labor Law; Labor Union; Pension; Sex Discrimination; Sexual Harassment; Whistleblowing.

## EN BANC

[Latin, French. In the bench.] Full bench. Refers to a session where the entire membership of the court will participate in the decision rather than the regular quorum. In other countries, it is common for a court to have more members than are